FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 1 2 2004

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGE HERRMANN, *et al.*, On Behalf of Themselves and All Others Similarly Situated, ) ) ) ) | |
| Plaintiffs, ) | CIVIL ACTION |
| v. ) | FILE NO. 1:04-CV-0365-JEC |
| GUTTERGUARD, INC., *et al.*, ) ) | |
| Defendants. ) | |

## PLAINTIFFS' RESPONSIVE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL

### I.   Summary of Proceedings Relevant to the Pending Motion

Plaintiffs filed their original Complaint herein on February 9, 2004 (docket no.

1).   The following day, Plaintiffs obtained an "Express Report" on Dixie

HomeCrafters, Inc. (hereinafter "Dixie") from Dun & Bradstreet which showed that

Plaintiffs had misnamed one of the Defendants.[1]   Plaintiffs filed an Amended

---

[1] See Affidavit of Plaintiffs' Lead Counsel William F. Kaspers dated and filed herein on May 12, 2004 (docket no. 65) (hereinafter "Kaspers Aff."), p. 13, ¶ 25 and Transcript of 5/14/04 Scheduling Conference (hereinafter "5/14 Conf.") 22:13-18 (all transcript citations are to the page(s) followed by a colon and then the line(s)). Plaintiffs initially sued GutterGuard, Inc., Dixie HomeCrafters and all affiliated companies.  While GutterGuard, Inc., Dixie HomeCrafters and Dixie HomeCrafters, Inc. are all affiliated companies, Dixie HomeCrafters, Inc. is the parent of GutterGuard, Inc. and thus the properly named co-defendant.

1

Complaint in which the Defendants were properly named on February 16, 2004 (docket no. 4).

Two days after filing their Amended Complaint, and in response to the "public filing" listed in the February 10 Dun & Bradstreet "Express Report" regarding Dixie, Plaintiffs discovered and obtained from a public file at the DeKalb County State Courthouse a copy of one of the invoices which the law firm of Fisher & Phillips LLP (hereinafter "F&P") attached to a fees lawsuit it filed against Dixie on October 30, 2000 (DeKalb County State Court docket no. 2000A-72824)(Kaspers Aff., pp. 13-15, ¶¶ 25-28). Plaintiffs provided a copy of this invoice[2] to Defendants during the February 27, 2004 attorneys' conference in this case (Id., pp. 15-16, ¶ 29) and to the Court on March 12, 2004 (see docket no. 22).

In their April 5 Response to Plaintiffs' Motion for Conditional Certification, Defendants noted that Plaintiffs' lead counsel Kaspers was a partner at F&P during the timeframe identified in the March 17, 2000 invoice,[3] then argued that the

---

[2]"Attachment D" to F&P 10/30/00 fees Complaint against Dixie, a copy of which is attached both to Defendants' June 25 Memorandum and to this Memorandum as "Attachment A," will be hereinafter referred to as "the March 17, 2000 invoice."

[3]The March 17, 2000 invoice references "compliance audits" conducted on February 7 and February 28, 2000—about a year prior to the commencement of the three-year statute of limitations Plaintiffs claim applies to their overtime compensation claims in this case.

2

March 17, 2000 invoice "has not been shown to have any connection to any of the facts in this case" (see docket no. 34, p. 24).[4]

However, two weeks later (on April 21), Defendants asked Kaspers and his firm to voluntarily withdraw from the case, and two weeks after that (on May 7), Defendants moved to disqualify Plaintiffs' chosen counsel, to prohibit them from communicating with or turning over their files or any of the documents they have obtained, collected or prepared to Plaintiffs or replacement counsel, and for sanctions. See docket no. 58, pp. 5-6.

Plaintiffs filed their response, including Kaspers' Affidavit, to Defendants' motion on May 12 (docket no. 65), explaining that Kaspers never acquired confidential, privileged or protected information regarding any Defendant during his prior association with F&P, explaining how Kaspers and his firm first learned that Dixie was a former client of F&P and how they discovered and obtained a copy of the March 17, 2000 invoice after filing Plaintiffs' Complaint with this Court and informing the Court that Plaintiffs and their counsel had already expended over

---

[4]More specifically, Defendants argued that it "does not refer to Defendant GutterGuard, the company that has employed Plaintiffs," that "none of the Plaintiffs were employed by GutterGuard during the dates to which ["Attachment A"] refers" and that none of the Plaintiffs or putative class members "were employed by Dixie HomeCrafters in February 2000." Id.

3

$250,000 in attorneys' and paralegals' time and expenses on this case (Kaspers Aff., p. 23, ¶ 37).[5]

Pursuant to an Order entered herein on May 24 (docket no. 73), Plaintiffs' action has been temporarily suspended pending a determination on Defendants' motion to disqualify (all other pending motions were dismissed without prejudice to re-filing five days after the Court rules on Defendants' motion to disqualify). Following the taking of the discovery referenced in footnote 5, Defendants filed their post-discovery memorandum on June 25 (hereinafter "the June 25 Memo"). This Response to Defendants' filing is made within the time allowed by this Court's Order dated June 30.

## II.     The Applicable Legal and Ethical Standards

**A.     Kaspers was not required to run a conflicts check with the firm with which he was formerly associated to determine whether F&P had ever provided legal representation to any of the Defendants before Kaspers and his new firm agreed to represent Plaintiffs.  The Rules of Conduct do not**

---

[5]More has been expended since Kaspers filed his Affidavit herein on May 12, including Plaintiffs' taking of the depositions of Kaspers' former F&P associates Jennifer Sandberg, Bert Brannen and John Thompson on May 13, 2004, the May 14 Scheduling Conference and Defendants taking of a 7-hour deposition of Kaspers on May 27 and the depositions of the three lead plaintiffs, George Herrmann, Ron Mathews and José Hernandez, on June 2. The transcripts of Kaspers', Sandberg's, Brannen's and Thompson's depositions were filed on June 25, and the transcripts of Herrmann's, Mathews' and Hernandez's depositions have been filed concurrently herewith.   Citations to transcripts of any of the depositions taken relating to Defendants' pending motion will be cited by the name of the deponent, followed by "Dep" and then the page and line(s) cited.

**require such a conflicts check and the evidence of record in this case shows it would have been a fruitless waste of time.**

While the Court queried several times during the May 14 Scheduling Conference whether Kaspers should have run a "conflicts check" with his former firm, F&P, before agreeing to represent Plaintiffs,[6] to Plaintiffs' knowledge, there is no law firm in this City or State (or anywhere else in this country, for that matter) which has a conflicts check procedure that includes making client inquiries of law firms with which attorneys of the firm were formerly associated.

There are two reasons why no law firm has such an outside-the-firm conflicts check procedure. For one thing, the ethical Rules don't require it. Georgia's Rules of Professional Conduct, which follow the American Bar Association's Model Rules (which replaced the American Bar Association's Model Code), expressly distinguish between imputed knowledge and actual knowledge for purposes of disqualification. Imputed knowledge requiring disqualification is addressed in Rule 1.10, which is entitled "Imputed Disqualification: General Rule."[7] Under Rule 1.10(a), knowledge is imputed to prohibit or disqualify lawyers from knowingly representing a client with a material adverse interest to a present or former client of the lawyer or of the lawyer's firm "[w]hile lawyers are associated in a firm." Rule 1.10(b) addresses the

---

[6] See 5/14 Conf. at 20:23-21:3, 36:19-37:23 and 65:11-17.

[7] The complete texts of Rules 1.6-1.10 and the accompanying Comments are attached hereto as "Attachment B."

5

conditions under which a law firm with which a lawyer was formerly associated is imputed to have knowledge prohibiting or disqualifying the firm from thereafter representing a client with material adverse interests to those of a client represented by the formerly associated lawyer. As Rule 1.10(b)(2) states, one of these conditions is whether any lawyer remaining in the firm has confidential and protected information which was obtained from the client during the representation by the formerly associated lawyer which is materially adverse to the matter for which representation by the firm is now sought. Lawyers and law firms can thus effectively avoid imputed disqualification under Rule 1.10 by conducting internal conflicts checks among all lawyers who currently work in the same firm.

Conspicuously absent from the imputed disqualification provisions of Rule 1.10 are any provisions applicable to the formerly associated lawyer. The provisions applicable to the formerly associated lawyer and the conditions under which s/he is prohibited or disqualified from thereafter representing a client with a material adverse interest are covered in Rule 1.9(b) and (c). Rule 1.9 contains **no** reference to imputed knowledge or information as a basis for prohibiting or disqualifying a lawyer from thereafter representing a client with a material adverse interest. The absence of such a reference in Rule 1.9, and the express inclusion of such a reference in Rule 1.10, demonstrates the substantive difference between the rules that apply to lawyers who

6

are associated (Rule 1.10(a)) and a law firm with whom a lawyer was formerly associated (Rule 1.10(b)), on the one hand, and the rules that apply to a lawyer who was formerly associated with a firm (Rule 1.9(b) and (c)), on the other:   while imputed knowledge and disqualification applies to lawyers still in the same firm and the law firm with which a lawyer was formerly associated, imputed knowledge and disqualification do **not** apply to formerly associated lawyers.

Defendants' suggestion to the contrary on page 4 of their June 25 Memo is simply wrong.   Defendants misdescribe Comment 6 to Rule 1.9 as purportedly "emphasiz[ing] that it is essential and entirely proper to rely on inferences of fact to support disqualification."  Id.  Comment 6 in fact states, "Access to information...is essentially a question of fact, **aided by** inferences" [emphasis added].   There is a huge difference between analyzing presented evidence with the **aid** of reasonable inferences, which this Court does regularly and is trained to do, and **relying** exclusively upon inferences, implications[8] and imputed knowledge, which Defendants propose be done under the guise of Rule 1.9 in this case.

One very practical reason why the Rules distinguish between the law firm of a former associate and the former associate her/himself for the purpose of imputing knowledge requiring disqualification is the manner in which law firms handle the

_____

[8]In their June 25 Memo, Defendants also discuss what Comment 6 to Rule 1.9 "implicitly [versus explicitly] recognizes."  Id.

transfer of files when a lawyer's association with a firm terminates.  Generally, the files of clients represented by the former associate who decide to continue to be represented by the departing associate are, at the clients' request, transferred to wherever the clients designate (usually the new office(s) of the former associate). However, the law firm with which the lawyer was formerly associated usually makes and retains a copy of those transferred files for malpractice insurance defense reasons. With a copy of those former client files still in the possession of the law firm from which the lawyer departed, it is easy to understand how lawyers who remain with the firm are imputed to have access to and knowledge of those former client's files.

Conversely, when a lawyer terminates her/his association with a firm, s/he never takes with her/him files of clients of the departed firm whom the departing lawyer never represented.  All the departing lawyer takes with her/him is whatever s/he happens to remember about work performed for clients of the departed firm. Whatever the lawyer never knew or fails to remember cannot thereafter be revealed or used against a client of the departed firm.  That is why applying an imputed knowledge standard to law firms of departed associates, while not applying the same standard to the departed associate, makes practical sense.  Stated differently, the reason why the Rules do not apply an imputed knowledge standard to departed associates (which the Court acknowledged during the May 14 Scheduling Conference

8

would be an easier standard for the Court to apply, since it generally would require fewer credibility determinations [see 5/14 Conf. 36:9]) is that the departed associate no longer has access to client files or information other than client files and information that the departed associate still has because of her/his continued representation of a particular client or clients.

Any question as to whether a violation of Rule 1.9(b) requires proof that a lawyer had in fact acquired knowledge of confidential and protected information and not simply imputed inferences that such knowledge may have been acquired while the lawyer was with her/his former firm is resolved by the language of Rule 1.9 and several of the Comments accompanying that Rule. Rule 1.9(b) expressly states that a lawyer must not **"knowingly"** represent a client with a material adverse interest in a substantially related matter "about whom the lawyer **had acquired information**...that is material to the matter" and still protected under the Rules [emphasis added].[9] Rule 1.9(c)'s prohibitions against thereafter using or revealing such information necessarily requires, as a factual precondition, that the still-protected information regarding the former client had actually been acquired during the prior representation, since otherwise it could not thereafter be used or revealed.

---

[9]As a noted commentator has written, "Rule 1.9(b)...applies...only where the lawyer in question **did** learn confidential information about the law firm's client." Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering, § 13, at 26.

9

Comment 8 to Rule 1.9 states: "Paragraph (b) operates to disqualify the lawyer **only when** the lawyer involved has **actual knowledge** of information protected by *Rules 1.6: Confidentiality* and *1.9(b): Conflict of Interest: Former Client.* **Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict**" [emphasis added].

Comment 10 to Rule 1.9 similarly provides, in pertinent part: "This obligation [of loyalty to a client] requires abstention from adverse representation by the individual lawyer involved [in the prior representation] but does **not** properly entail abstention of other lawyers **through imputed disqualification**" [emphasis added].[10]

In addition to the express provisions of Rule 1.9 and the accompanying Comments, which require actual, not imputed, knowledge of still-protected information for purposes of disqualification, and the clear difference between those provisions and the imputed knowledge and disqualification provisions of Rule 1.10, a second and more practical reason why lawyers or law firms with whom a lawyer was formerly associated do not extend conflicts checks beyond the firm to lawyers

---

[10]Comment 4 to Rule 1.9 additionally notes that the "difference between a partner and an associate" has been historically exaggerated and is immaterial, for purposes of disqualification, "in modern law firms."

formerly associated with the firm or to law firms with whom those lawyers are now associated is demonstrated in the record of this case. During the May 13 deposition of Kaspers' former F&P associate Jennifer Sandberg, F&P's counsel instructed Sandberg **not** to disclose the names of any present or former clients of F&P without a protective order signed by a court of law. Sandberg Dep. at 100:19-101:1, 105:22-25 and 106:7-11.

While Plaintiffs believe that F&P overstated the scope of information protected by the Rules and/or the attorney-client privilege (since whenever F&P enters an appearance on behalf of a client in a matter of public record, F&P's representation of that client is no longer confidential, protected or privileged),[11] the above-cited excerpts from Sandberg's deposition show that if Kaspers or his firm, before agreeing to represent Plaintiffs, had contacted F&P to see whether F&P had ever represented any of the Defendants, F&P would have refused to provide Kaspers or his firm with an answer to the inquiry without a protective order signed by a court of law (which Kaspers could not obtain unless he had already agreed to represent Plaintiffs)—

---

[11]Fisher & Phillips' counsel implicitly agreed that the asserted privilege was overstated by changing the stated basis of his objection (to "I'm not going to allow her to speculate") when Sandberg was asked to identify matters in federal or state court litigation for which Kaspers was responsible while he was with F&P. Sandberg Dep. at 106:12-107:4.

regardless of whether Kaspers had personally been involved in the legal representation of the present or former F&P client.[12]

For both of the above reasons, lawyers and law firms simply do not include firms with whom they or its lawyers were formerly associated in their conflicts checks procedures. That is why Kaspers' former F&P' partner Brannen admitted during his May 13 deposition that he (Brannen) does not contact the law firm with which Brannen was formerly associated, Defendants' counsel Jackson & Lewis LLP, before Brannen agrees to represent a new client. Brannen Dep. at 53:7-9 and 56:11-18. It is also why Kaspers and his firm were neither required nor expected to contact F&P before agreeing to represent the Plaintiffs herein. As the record of this case indicates, such a contact would have been not only more than the Rules required, but also a futile and unnecessary waste of time.[13]

This is also why Rule 1.9(b) and Rule 1.10(a) only proscribe a lawyer from "knowingly" undertaking the representation of a client whose interests are materially adverse to a client about whom the lawyer acquired protected and confidential

---

[12]In this case, it is undisputed that Kaspers never provided legal representation to any of the Defendants.

[13]It also may have constituted a violation of Kaspers' confidentiality obligation to his prospective clients. See, e.g., Vermont Bar Assn. Advisory Ethics Opinion 2000-10 (a lawyer may not reveal the identity of a caller seeking legal representation or the subject matter of the call where the caller desires to sue his employer and the employer happens to be an institutional client of the lawyer's firm)(copy attached hereto as "Attachment C").

information in a prior substantially related matter. If a lawyer does not know or remember or is in any way unsure about whether s/he or a firm with which s/he was formerly associated ever provided legal representation to a client with material adverse interests in a substantially related matter, there is simply no way, as a practical matter, that the lawyer can go to her/his former firm and request a conflicts check without potentially jeopardizing the client confidences of the former firm and/or potentially breaching the lawyer's confidentiality obligation to her/his prospective client.

Finally, even **if** imputed knowledge was sufficient to justify disqualification under Rule 1.9, as will be shown in the summary of the record evidence in Point III below, the gaps in Defendants' evidentiary presentation, as well as Plaintiffs' undisputed documented evidence of the way in which they obtained the information reflected on the March 17, 2000 invoice regarding Dixie, are more than sufficient to justify a finding that Defendants have failed to meet their burden of proving that disqualification is required in this case; stated differently, through the evidence Plaintiffs have presented, they have effectively rebutted any rebuttable presumption any of the inferences Defendants have placed or attempted to place upon Kaspers and/or his firm.

**B.      An appearance of impropriety is no longer a legitimate basis upon which to disqualify an attorney in this Circuit or this State.**

There is no question that the law and ethical standards relating to disqualification have changed dramatically over the last several decades in conjunction with and in response to the increased mobility of lawyers from one firm to another and the concomitant tremendous increase in the size of many law firms. Curiously, the only two cases cited by Defendants in their June 25 Memorandum are no longer good law in this Circuit or this State. <u>W.L. Gore & Associates, Inc. v. Internat'l. Medical Prosthetics Research Assocs., Inc.</u>, 745 F.2d 1463 (Fed.Cir. 1984)[14] and <u>Burnette v. Morgan</u>, 303 Ark. 150, 794 S.W.2d 145 (Sup.Ct.Ark. 1990),[15]

---

[14]While Defendants describe the facts in <u>Gore</u> as "surprisingly parallel to the present case" (Defendants' Memorandum, p. 14), the facts in <u>Gore</u> are distinguishable both procedurally and substantively.    Procedurally, plaintiff Gore (a) raised the disqualification issue 3 days after his opposing party retained the challenged counsel, (b) moved to disqualify that counsel less than 2 weeks later and (c) obtained an order of disqualification 3 weeks after that which left Gore's adversary with the same co-counsel he had used since the commencement of the litigation and thus "no serious hardship" or "significant lost time and expense in bringing new counsel 'up to speed.'"  745 F.2d at 1467.  In contrast, in the case at bar, Defendants waited almost 11½ weeks after service of Plaintiffs' Complaint and 9 weeks after service of the March 17, 2000 invoice (from February 27 to April 21) before raising the issue of disqualification, and another two weeks after that, when they were otherwise required to respond to Plaintiffs' written discovery, before filing their motion to disqualify. During the time that Defendants waited to raise or file the issue, dozens of filings were made, unfiled discovery and written responses were served by both sides, and additional plaintiffs were added to the litigation while Kaspers and his firm functioned as sole counsel for all of the named Plaintiffs.  Substantively, the co-counsel whom Gore challenged conceded that one of its three named partners had played "an active role" in Gore's former legal representation (745 F.2d at 1465), whereas here it is undisputed that neither Kaspers nor his firm ever represented any Defendant.

cited respectively on pages 14 and 24 of Defendants' June 25 Memo, were decided respectively 20 and 14 years ago. Both decisions were based upon the proscription in Canon 9 of the American Bar Association's **former** Model Code of Professional Responsibility that "[a] lawyer should avoid even the appearance of professional impropriety." See Gore, supra at 1467 and Burnette, supra at 156.[16]

In Waters v. Kemp, 845 F.2d 260 (11th Cir. 1988), Circuit Judge Tjoflat (writing for the Court), after noting that "[t]he Model Code has been replaced by the Model Rules," held that "[u]nder the Model Rules, the appearance of impropriety is **not** a ground for disqualifying a lawyer from representing a party to a lawsuit." Id. at 265 (emphasis added). While footnote 12 in Waters expressly references the

---

[15]In Burnette, it was undisputed that the challenged counsel at various times worked on and therefore expected to receive a fee from both sides of the case. 303 Ark. at 153-4. Under such circumstances, prejudice to the system was automatic and did not have to be separately established.

[16]Two of the three additional cases cited by Defendants in their May 7 Memorandum (including the only case cited by Defendants during the May 14 Scheduling Conference) were also decided based upon "an appearance of impropriety" standard. See Summerlin v. Johnson, 176 Ga.App. 336, 341 (Ga.Ct.Apps. 1985), and Brennan's, Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168, 172 (5th Cir. 1979). The only other case cited by Defendants in their May 7 Memorandum, Government of India v. Cook Industries, Inc., 569 F.2d 737 (2nd Cir. 1978) was also decided when "even an appearance of professional impropriety" was enough to justify disqualification. Id. at 741. Interestingly, **Defendants have cited no case authority** in either their May 7 or June 25 memorandum decided **within the past 14 years to support the relief requested** by Defendants in the case at bar—the disqualification of an adversary's chosen counsel, the second most severe civil sanction that can be imposed in a civil case (the first being dismissal or the entry of a judgment against a party's claims with prejudice).

elimination of the appearance of impropriety approach to disqualification in Model

Rules 1.10 and 1.11, Comment 5 to Rule 1.9 indicates that the "appearance of

impropriety" approach has been eliminated from Rule 1.9 as well:

> The...rubric **formerly used** for dealing with disqualification is the appearance
> of impropriety proscribed in Canon 9 of the ABA Model Code of Professional
> Responsibility. This rubric has a twofold problem. First, the appearance of
> impropriety can be taken to include any new client-lawyer relationship that
> might make a former client feel anxious. If that meaning were adopted,
> disqualification would become little more than a question of subjective
> judgment by the former client. Second, since "impropriety" is undefined, the
> term "appearance of impropriety" is question-begging. It therefore has to be
> recognized that **the problem of disqualification cannot be properly resolved**
> either by simple analogy to a lawyer practicing alone or **by the very general**
> **concept of appearance of impropriety.**

(Emphasis added).

As noted in Waters' footnote 12, even prior to the elimination of the

"appearance of impropriety" approach to disqualification in the Model Rules and the

Eleventh Circuit, "several courts had observed that an 'appearance of impropriety' is

simply too slender a reed on which to rest a disqualification order except in the rarest

cases.... Board of Educ. v. Nyquist, 590 F.2d 1241, 1247 (2nd Cir. 1979). See also

United States v. Judge, 625 F.Supp. 901 (D.Haw. 1986)." See also Bergeron v.

Mackler, 225 Conn. 391 (1993)(rejecting appearance of impropriety standard), and

State v. Dimaplas, 267 Kan. 65 (1999)(finding "appearance of impropriety" approach

no longer viable).

Just as Judge Tjoflat and the <u>Waters</u> court did in footnote 13 of that decision, even if an "appearance of impropriety" standard could be applied to the facts of this case (it cannot), there would be no basis for disqualification here. Dixie knew, or reasonably should have known, when it decided not to pay F&P for the 2/7/00 and 2/28/00 "compliance audits" referenced in the March 17, 2000 invoice, that such a decision could lead, pursuant to Rule 1.6(b)(1)(iiii), to the filing and resulting publication of the March 17, 2000 invoice (as well as any other outstanding F&P invoices that Dixie decided not to pay) as attachments to a fees complaint for services rendered and due under contract in the appropriate state court. Dixie further knew or reasonably should have know that, once such a filing was made and publication occurred, whatever information was reflected on the March 17, 2000 invoice (and any other unpaid invoices attached to and filed with the Complaint) thereby became a matter of public record and lost whatever confidential, privileged and protected status the entries on such an invoice might otherwise have enjoyed.

**C.  A party's right to representation by counsel of her/his choice has become an increasingly important consideration whenever disqualification is sought.**

One of the reasons why inferences, implications, imputations and appearances have been replaced by the requirement of proof that a lawyer actually acquired knowledge of confidential and protected materially adverse information be presented to justify disqualification under Rule 1.9 is the increasing recognition of a party's

17

right to retain the counsel of her/his choice.  The Second Circuit, which appears to

have faced motions for disqualification earlier and with greater frequency than the

federal courts in other parts of the country,[17] was one of the first to recognize a

reluctance to disqualify attorneys derived "from the fact that disqualification has an

immediate adverse effect on the client by separating him from counsel of his choice."

Board of Education v. Nyquist, 590 F.2d 1241, 1246 (2nd Cir. 1979).  Several years

later, both the Eleventh Circuit and courts within Georgia began to recognize the

devastating impact disqualification had or could have on a party's right to proceed

with her/his chosen counsel.  See, e.g., Norton v. Tallahassee Memorial Hospital, 689

F.2d 938, 941 n.4 (11th Cir. 1982)(disqualification recognized as "a harsh sanction"

because it so "often work[s] substantial hardship on the client"; evidence therefore

required "that some specifically identifiable impropriety [creating public suspicion]

did in fact occur" sufficient to "outweigh the social interests...served by the

attorney's continued participation in the case"),[18] and Blumfeld v. Borenstein, 247

---

[17]See, e.g., J.P. Foley & Co., Inc. v. Vanderbilt, 523 F.2d 1357 (2nd Cir. 1975), Lefrak
v. Arabian American Oil Company, 527 F.23 1136 (2nd Cir. 1975), W.T. Grant
Company v. Haines, 531 F.2d 671 (2nd Cir. 1976), Allegaert v. Perot, 565 F.2d 246
(2nd Cir. 1977), Armstrong v. McAlpin, 625 F.2d 433 (2nd Cir. 1980).

[18]Coincidentally, Kaspers was also lead counsel in Norton, not of the party whose
counsel was disqualified on the court's own motion (see 511 F.Supp. 777 (N.D.Fla.
1981)), but for the defendant hospital.  The relationship between Tallahassee's City
Commission and the Hospital's counsel, discussed in the next to last paragraph of
Judge Tjoflat's opinion in Norton, refers to Kaspers' local co-counsel in Norton, who

Ga. 406 (Ga.S.Ct. 1981)("Basic fairness will not permit the disqualification of an attorney because of wrongdoing imputed to the attorney...**the right to counsel is an important interest which requires that any curtailment of the client's right to counsel o f choice be approached w ith g reat caution. The mere fact that the public may perceive some conduct as improper is, without some actual impropriety, insufficient justification for interference with a client's right to counsel of choice.**" (Emphasis added)

More and more courts have both recognized and weighed the importance of a party's right to counsel in the consideration of any motion to disqualify. See, e.g., LeaseAmerica Corp. v. Stewart, 19 Kan.App. 2d 740, 750 (1994)("The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances."); Piedmont Hospital, Inc. v. Reddick, 2004 WL 574805 (Ga.App. March 24, 2004)("**The right to counsel is an important interest which requires that any curtailment of the client's right to counsel of choice be approached with great caution....[D]isqualification has an immediate adverse effect on the client by separating her from counsel of her choice.**") (Id. at pp. 7-8). See also Georgia Baptist Health Care System v. Hanafi, 253 Ga.App. 540, 541 (Ga.Ct.Apps. 2002).

---

functioned as the attorney for the City of Tallahassee and its Commission at the same time he was representing the defendant hospital.

Interestingly, in their June 25 Memo, Defendants say nothing whatsoever about Plaintiffs' right to counsel of their choice, about the Petitions Plaintiffs filed on May 12 expressing their desire to retain their chosen counsel or about the testimony Defendants elicited from the lead plaintiffs on June 2 (that Plaintiff George Herrmann "was excited about finding Kaspers & Associates" [Mathews Dep. at 14:21-22], that Plaintiff Ron Mathews was "satisfied" with Plaintiffs' choice of counsel [id. at 22:8-9] and that Plaintiff José Hernandez "want[ed] to keep this firm" [J.Hernandez 6/2 Dep. 25:15].

**D.      Another major concern has been the increasing use of motions to disqualify for strategic purposes.**

The use of motions to disqualify for strategic purposes (to delay and disrupt the litigation and, at the very least, unnerve opposing party at the potential loss of their chosen counsel) has unfortunately become increasingly common.   As the Second Circuit noted in Board of Education v. Nyquist, supra, "disqualification motions are often interposed for tactical reasons."   Id. at 1246.   The misuse of disqualification motions "for tactical advantage in litigation" was expressly recognized in Margulies by Margulies v. Upchurch, 696 P.2d 1195, 1204 (Utah 1985), and more recently in Comment 15 to Rule 1.7 ("Conflict of Interest: General Rule")("…Such [a conflict of interest] objection [raised by opposing counsel] should be viewed with caution…for it can be misused as a technique of harassment.").   As the Georgia Court of Appeals

recently recognized in Piedmont Hospital, Inc. v. Reddick, supra, "Disqualification...results in expense and delay that are costly both to the client and to the administration of justice." Id. at p. 8. See also Georgia Baptist Health Care System, supra at 541.

A review of the evidence presented (or lack thereof) in the record in this case, as summarized in Point III below, reveals that Defendants' motion has also been filed for strategic, rather than evidentiary, reasons.

**E.     The question presented in this case is whether Kaspers actually acquired information about Dixie during his prior association with F&P that is confidential and protected from disclosure in the instant litigation.   To answer that question, the Court must identify the information that Kaspers purportedly acquired during his association with F&P and then determine whether that information is still protected under Rule 1.6 or whether it has instead become generally known and is thus no longer protected.   If the information purportedly disclosed to Kaspers is no longer protected from disclosure, then none of the factual issues asserted by Defendants are material, and this Court can thus avoid having to make credibility determinations on those issues.**

As soon as F&P agreed to represent Dixie (in May 1998), F&P entered a public appearance as Dixie's legal representative in the Bethel sex harassment case then pending against Dixie.   The Bethel case is totally unrelated to the instant litigation and F&P's work on that case—the reason why F&P was hired by Dixie—was also totally unrelated to the claims at issue here.   The legal services reflected on the March 17, 2000 invoice, while chronologically distinct from the admissible period at issue here, are nevertheless relevant to the extent that the "wage and hour review of job

21

titles and job duties of the 200 employees at all businesses" included crew chiefs, installers and/or run-off crew members employed at Defendants' Atlanta location[19] can be used to show that Defendants' subsequent decisions to discontinue the payment of overtime compensation to production employees and not to pay the named Plaintiffs and similarly situated employees thereafter for overtime hours worked and overtime compensation due during the actionable period (from February 9, 2001 to the present) were "willful." See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 134 (1988)(plaintiff must show that employer either knew or showed reckless disregard whether its no-overtime pay practice violated the FLSA).

However, Defendants must also prove that the information they allege Kaspers acquired during his former association with F&P regarding that firm's legal representation of Dixie on matters material to this case (i.e., wage and hour, not sex harassment defense) satisfy the "confidential and protected" and thus not "generally known" requirements set forth in Rules 1.6, 1.9 and 1.10.

Comment 11 of Rule 1.9 expressly states:

> Information acquired by the lawyer in the course of representing a client may not subsequently be used or revealed by the lawyer to the disadvantage of the client. However, **the fact that a lawyer has once served a client does not**

---

[19]Defendants submitted as "Attachment A" to Defendants' April 5, 2004 Response (docket no. 34) a Supplemental Affidavit of Jeffrey Howe stating (in ¶ 3 on p. 2) that Defendants opened their Atlanta location in January 2000—less than two months prior to the 2/28/00 "wage and hour review." At the same time, none of the named Plaintiffs were employed by Defendants as of 2/28/00.

**preclude the lawyer from using generally known information about that client when later representing another client.**

(Emphasis added).  Kaspers never personally represented any of the Defendants.  In Bank of Tokyo Trust v. Urban Food Malls, 229 App.Div.2d 14, 31, 650 N.Y.S.2d 654, 665 (1996), the court held:  "A party seeking disqualification must identify the 'specific confidential information imparted to the attorney.' [citation omitted] General allegations of confidential information received, such as, that 'Mr. G had unrestricted access to the [former client's]...documents' will not do."  As more recently stated in Jamaica Public Service Co. Ltd. v. AIU Insurance Company, 92 N.Y.2d 631, 638 (N.Y.Ct.Apps. 1998) ("Allowing a party seeking disqualification to meet its burden by generalized assertions of 'access to confidences and secrets' would both make it difficult, if not impossible, to test those assertions and encourage the strategic use of such motions.  In such instances, courts could not determine whether a former attorney's alleged information was in fact a 'confidence' or a 'secret.'")

In the Jamaica Public Service Co. Ltd. case, the information that the party seeking disqualification complained about its adversary was readily available to any member of the public through the complaining party's public filings with state and federal administrators which made the information at issue thus "generally known." Id. at 638.  In another recent case also similar to the case at bar, Barragree v. Tri-

county Electric Cooperative, Inc., 263 Kan. 446 (Kan.Sup.Ct. 1997), the court, after noting that the burden of proof for disqualification under Rule 1.9 rested upon the party seeking disqualification (id. at 463) and finding that the lower court had committed reversible error by failing to identify the specific information that allegedly could be used to the former client's disadvantage, found that the financial information which the movant was complaining about his adversary having was not only not current (similar to the timing issue noted above between the 2/28/00 "wage and hour review" and the 2/9/01 commencement of the actionable period for Plaintiffs' claims) but had already been made a matter of public knowledge as a result of the movant's filings in other public lawsuits. Both the Jamaica Public Service Co. Ltd. and Barragree cases are directly on point with the facts presented here. Copies of both decisions are attached as "Attachments D and E."

### III.    The Facts of Record

1.    Dixie became a client of F&P in May, 1998 (Brannen 5/3/04 Affidavit, ¶ 4; Brannen Dep. at 33:19).  F&P and its lawyers Brannen, Christine Howard and Sandberg immediately (on or about May 20, 1998) filed their appearances on behalf of Dixie in a sex harassment lawsuit then pending against Dixie in federal district court in the Northern District of Georgia entitled Linda Bethel v. Dixie HomeCrafters, Inc., et al. (N.D.Ga. Civil Action No. 99-CV-583)(see Bethel docket

24

nos. 4-6). **F&P's legal representation of Dixie, and Dixie's status as a client of F&P, thus became m atters of public record and general public k nowledge in May, 1998**.

2.     F&P's March 17, 2000 invoice to Dixie reflecting "compliance audits" which F&P's associate Sandberg conducted for Dixie on February 2 and February 27, 2000, **became a matter of public record and general public knowledge on or about October 30, 2000,** when it was attached as "Attachment D" to the fees complaint that F&P filed against Dixie in DeKalb County State Court (docket no. 2000A-72824). Defendants concede that "[w]hat you see on there ["Attachment D"—the March 17, 2000 invoice] is part of the public file" (Defendants' counsel Owens at Sandberg Dep. 85:20-21) and has been since on or about October 30, 2000.  Both Defendants and F&P have maintained that any information relating to the substance, content or communications which occurred during the February 2 and February 27, 2000 compliance audits **other than what is reflected on the March 17 invoice and "a matter...of public record"** remain confidential, privileged and protected (id. at 85:22-25, 87:20-22, 108:1-2 and 108:7-8).  The specific factual issue presented in this case is whether Kaspers acquired, during and from his association with F&P (which ended on August 18, 2000 [Kaspers 5/27/04 Dep. 133:18 and 163:20]), any information regarding F&P's representation of Dixie which had not become a matter

of public record and general public knowledge (through filings in either the Bethel case or the fees suit) which Kaspers could reveal or use to Dixie's disadvantage when Kaspers met Plaintiffs on January 27, 2004 (Kaspers 5/27/04 Dep. 168:15).

3.      In order to understand the evidence of record on this issue, a brief overview of F&P and Kaspers' relationship (or lack thereof) with F&P attorneys Brannen, Howard and Sandberg is helpful. When Dixie became a client of F&P in May, 1998, F&P had 80-85 attorneys in its Atlanta office servicing thousands of clients (Kaspers 5/12/04 Affidavit, p. 7, ¶ 13; Kaspers 5/27/04 Dep. 25:19). These 80-85 attorneys were assigned to administrative (versus practice) teams of 15-20 lawyers (Sandberg Dep. at 62:15-17). "These teams got periodically reconstituted." Kaspers Dep. at 30:21-22. When Dixie became a client of F&P in May, 1998, and during the first year of F&P's representation of Dixie, Kaspers was on a different administrative team than Brannen, Howard or Sandberg. Kaspers Dep. at 31:6-8.[20] The "Team One" which Brannen and Sandberg both testified about Kaspers joining in February, 2000 (Brannen 5/3/04 Aff., p. 2, ¶ 7, Brannen Dep. at 12:15-18 and Sandberg Dep. at

---

[20]Defendants' focus throughout their June 25 Memorandum exclusively on the period from April 1999 through August 2000 conveniently ignores the period from May 1998 to April or May 1999, when F&P attorneys Brannen, Howard and Sandberg represented Dixie in the Bethel sex harassment case and may well have mentioned Dixie at a team meeting Kaspers did not attend because he had not yet been assigned to the same team. Obviously, **any mention of Dixie at a team meeting attended by Brannen, Howard or Sandberg between May 1998 and April 1999 could not have been heard by Kaspers since he was not a member of the same team during that period.**

64:7-10) and which the parties discussed during the May 14 Scheduling Conference was a Team One that was reconstituted following a F&P partnership retreat on February 5, 2000 (Kaspers Dep. at 119:20-22). The reconstituted Team One had Brannen as captain (replacing pre-reconstituted Team One captain Don Wright) [id. at 105:18-20 and 119:12-13] and several new, albeit experienced attorneys [id. at 33:19-20, 101:16-17 and 122:20-22] first met as a team on February 11, 2000 (id. 125:8-9). When the pre-reconstituted Team One was discussed for the first time in this case during Kaspers 7-hour deposition on May 27, Kaspers readily admitted that there were a number of pre-reconstituted Team One meetings chaired by Don Wright which Kaspers, Brannen and Sandberg attended between April, 1999 and February 11, 2000.[21]

4.   Defendants cite four different pages of Sandberg's deposition (pp. 72, 96, 97 and 99) as well as Brannen's deposition to show that Sandberg discussed Dixie during Team One meetings (June 25 Memo, pp. 8-9). A review of actual testimony on the cited pages is informative:

---

[21]In an attempt to impeach Kaspers' credibility, Defendants' June 25 Memo mentions nothing about the February, 2000 reconstitution of Team One, even though Kaspers mentioned the reconstitution 19 different times during his deposition (Kaspers Dep. at 30:22, 33:19, 52:10, 101:15, 101:18, 105:19, 117:20, 117:24, 125:4, 125:25, 127:4, 127:19, 128:8, 128:16, 128:18, 134:14, 135:11, 154:8 and 163:19) and Defendants asked Kaspers about the reconstitution (see Kaspers Dep. at 101:9-10 and 102:1-2).

Sandberg Dep.:

72:5-11:    "I talked about Dixie HomeCrafters in Team One meetings…I **don't know if you [Kaspers] were there or not.**"

96:21-23:    "I recall discussing Dixie HomeCrafters in Team One meetings. **I do not recall if you [Kaspers] were present.**"

Brannen Dep.:

23:23-24:12: **"I know two facts.** I know that I have specific recall of Dixie HomeCrafters being discussed at a team meeting, **and I have specific recall of you [Kaspers] having attended Team 1 meetings.**

    **Q:** **Do you have specific recall of the bridge between those two memories?**

    **A:** **I do not.**

    **Q:** **Okay. So that the record is clear, you don't have any present recollection of Kaspers being in attendance at a Team One meeting when Dixie HomeCrafters was discussed.**

    **A:** **I don't have any specific recall of that, that's true.**

24:25-25:3:

    **Q:** **Do you know whether Kaspers was in attendance at any Team One meeting when that was discussed?**

    **A:** **I don't have that specific recall.**

There are several reasons why Sandberg and Brannen cannot place Kaspers at any particular Team One meeting, pre or post the February, 2000 reconstitution of Team One. For one thing, the meetings were brief, typically lasting no more than half an hour (Sandberg Dep. at 67:5). Second, because Kaspers was the most experienced employment litigator in the Atlanta office of F&P and had scheduling conflicts attending such a status within the firm, Kaspers was at best a "**relatively faithful**" attendee at T eam One meetings (Brannen Dep. at 5 9:4). While B rannen

testified that Team One met "approximately three times a month" (Brannen Dep. at 44:11) (Brannen was unclear whether he was referring to the pre or post reconstituted Team One), Kaspers attended n o Team One meetings the l ast month h e was with F&P (Kaspers Dep. at 163), he often attended only 1 of the 3 monthly meetings and missed the other two (id. at 104-119, 132-33 and 163), if there was a Team One meeting the Friday before the February 5, 2000 partnership retreat and the subsequent reconstitution o f Team One, Kaspers never knew of s uch a m eeting and therefore missed it (id. at 119:25-120:2), and the rest of the time Kaspers made no more than 2 of the 3 meetings in a month and missed the third (id. at 130 and 132-3). Kaspers' haphazard a ttendance r ecord e xplains w hy D efendants' w itnesses r epeatedly s tated that they were unable to place Kaspers at any pre or post reconstituted Team One meeting, and why Kaspers' insistence that he never attended a Team One meeting at which Dixie or any work done or to be done for Dixie was ever discussed is so plausible.

Kaspers unequivocally denies that he acquired **any** knowledge that Dixie was a client of F&P during Kaspers' association with that firm or that Dixie or F&P's representation of Dixie was ever mentioned at any Team One meeting that Kaspers attended (Kaspers Aff., ¶ 6 ["Prior to the filing of the above-styled action on February 9, 2004, I had acquired no information that F&P had ever provided legal

representation to any of the Defendants"] and Kaspers Dep. 137:7-10 ["**I know what was not said.  I know that I never heard any references to Dixie HomeCrafters, Inc., to GutterGuard, to Dixie HomeCrafters or any affiliated company."**]

Kaspers' unequivocal denial is corroborated by (1) the documented paper trail that Kaspers has presented showing how he came to learn, after filing Plaintiffs' Complaint herein, from a Dun & Bradstreet "Express Report," the public filing listed therein, and the public file that he obtained from the DeKalb County State Court, that Dixie had been a former client of F&P which received the services reflected on the March 17, 2000 invoice (see Kaspers Aff.); Defendants have not challenged (or even mentioned) Kaspers' documented explanation as to when and how he discovered the information that he obtained regarding Dixie; and (2) the three named Plaintiffs, who testified that when they met Kaspers for the first time (on January 27 of this year), Kaspers said nothing to indicate or in any way suggest that he or his firm knew anything about Dixie or its affiliated company GutterGuard, Inc. other than what the named Plaintiffs related to him and them.  G.Herrmann Dep. at 44:20-45:2 and 45:10-16, R.Mathews Dep. at 25:16-27:1 and 24:11-13, and J.Hernandez Dep. at 25:5-11).

While Defendants would like this Court to infer whether Kaspers actually heard Dixie's name mentioned as a client of F&P at any Team One meeting Kaspers attended (and along the way make a credibility determination against Kaspers), it is

unnecessary for this Court to go there because: (1) **there is no evidence in the record that Kaspers was present during any Team One meeting in which Dixie was mentioned as a client of F&P; to the contrary, the only evidence in the record on this factual issue is that Kaspers was not, in fact present;** as mentioned in Part II above, disqualification under Rule 1.9 cannot be based exclusively upon inferences; moreover (2) whether Kaspers learned that Dixie was a client of F&P any time between April or May, 1999 (when Kaspers joined the pre-reconstituted Team One captained by Don Wright) and August 18, 2000 (when Kaspers terminated his association with Fisher and Phillips) is **immaterial** to the motion presently pending before the Court, because F&P's legal representation of Dixie became a matter of public record and general public knowledge when F&P entered an appearance on behalf of Dixie in <u>Bethel</u> in May of 1998; this information thereby lost any protection it might otherwise have enjoyed under the Rules.

5.      While Defendants cite pages 24-27 of Brannen's deposition purportedly to show that more was discussed at a Team One meeting than merely Dixie's name as a client of F&P (June 25 Memo, p. 9), a closer look at Brannen's and Sandberg's testimony is again informative. After mentioning that legal services provided to Dixie were discussed at a Team One meeting (Brannen Dep. at 24:13-24), Brannen was asked to be more specific; he testified:

"The employment review that was to be conducted by Jennifer Sandberg was specifically mentioned at or about the time we secured that engagement." (Brannen Dep. at 25:11-14)

Sandberg "rather proudly announced that she was going to be out of the office having some client contact with this client and over the series of several meetings was going to provide a review of various employment-related matters..." (Id. at 25:19-24).

Sandberg announced at a Team One meeting "that she would be performing the work for Dixie" (id. at 26:23-25) and "that she would be conducting this over several visits." (Id. at 27:7-8).

Sandberg made this announcement "sometime prior to 2/7/00" [the date of the first "compliance audit reflected on the March 17, 2000 invoice] (id. at 28:16-20) and "when she discussed what she was going to do" Sandberg said, "Conduct Phase One" (id. at 30:6-15).

Because the Phase One 2/7/00 session described on the March 17, 2000 invoice makes no reference to wage and hour advice (that appears on the March 17 invoice as part of Phase Two on 2/28/00), Brannen was asked, even more specifically:

Q:   Do you know whether...attorney Sandberg ever mentioned providing wage and hour advice to Dixie HomeCrafters, Inc. during any Team One meeting?

After a thoughtful pause, Brannen responded: "Not specifically." (Id. at 32:15-19).

Brannen also testified that he did not recall "ever mentioning at any Team One meeting...providing wage/hour advice to Dixie or any of its affiliates." (Id. at 39:6-10).

There is **no evidence** that Kaspers was present when Sandberg made the above-described announcement at a Team One meeting (see the above-cited

32

testimony of Brannen and Sandberg admitting that they did not know and could not recall whether Kaspers was present when Dixie's name was mentioned at a Team One meeting; if they cannot recall whether Kaspers was present when Dixie's name was mentioned, they obviously also cannot recall whether Kaspers was present when Sandberg announced the work she was about to do for Dixie).  The only evidence regarding whether Kaspers was present when the work to be done for Dixie was discussed is Kaspers' unequivocal denial that he was present or heard any such discussion:  **"I know what was not said....I know that I never heard any reference to an employment law review for Dixie HomeCrafters, Inc. or for GutterGuard or for any of the affiliated companies.  I know that I never heard about any wage and hour review for Dixie HomeCrafters, Inc., GutterGuard or any of their affiliated companies."**  Kaspers Dep. at 137:7-16.  See also id. at 145:16-22, 146:2-7, 146:9-10, 146:12-13 ("I heard no such discussion") and 160:6-7.  Sandberg corroborated Kaspers' testimony when she testified:  "I don't recall ever discussing wage/hour with you [Kaspers]."  (Sandberg Dep. at 59:23-24).

Not only have Defendants failed to present any evidence that Kaspers was present when the employment law review (Phase One) and/or the wage and hour review was announced/discussed at a Team One meeting, a comparison of Brannen's and Sandberg's above-cited testimony regarding Sandberg's announcement with the

33

March 17, 2000 invoice shows that Sandberg's announcement and discussion at the Team One meeting went no further than what is reflected on the March 17 invoice, which Defendants have already conceded is part of a public file and thus general public knowledge and therefore not subject to the protection of the Rules. Accordingly, whether Kaspers was or was not present during such an announcement/discussion is, once again, **immaterial** to a resolution of Defendants' pending motion.

6.      The real factual issue in this case is whether Kaspers was present during a Team One meeting when wage and hour work performed for Dixie—more specifically, the substance, content or communications of the "wage and hour review" Sandberg conducted on February 28, 2000 as part of Phase Two (see the March 17, 2000 invoice)—was ever discussed. The record is clear that there never was such a discussion at any Team One meeting, so that whether or not Kaspers was present once again becomes **immaterial**:

> Sandberg Dep:
>
> Q:      Did you ever spend time during a Team One meeting going over the rudiments or the basic aspects of an employment and/or wage and hour law presentation that you were going to make to some client?
> A:      No. (Sandberg 5/12/04 Dep. 75:21-76:1)
>
> Brannen Dep:
>
> Q:      Was there ever a Team One meeting when Kaspers was a member where the basics of employment law or the basics of wage and hour law, kind

of the nuts and bolts that would be presented to a client, was the subject of a Team One meeting?

A:     Not at the normal Friday morning meeting, to the best of my recollection. (Brannen 5/12/04 Dep. 62:16-23)

"Typically that's not the kind of thing that we would cover in a team meeting" (id. at 63:13-14) "or discuss at the meetings" (id. at 63:24-25).

Brannen testified that Sandberg's announcement at the Team One meeting was made "sometime prior to 2/7/00" (Brannen Dep. at 28:18-20) and that Sandberg "discussed what she was going to do" [id. at 30:8-9]). Neither Brannen nor Sandberg testified that there was ever any subsequent announcement or discussion at any Team One meeting of anything Sandberg did or Sandberg or Dixie said during either the February 7 or the February 28 phases of the employment law review reflected on the March 17 invoice.  Finally, as Kaspers' Supplemental Affidavit attached hereto as "Attachment F" indicates, Kaspers never attended, read, heard or knows anything about either Phase One or Phase Two of the Employment Law Review which the March 17, 2000 invoice shows Sandberg conducted for Dixie on February 7 and 28, 2000--other than what he learned from obtaining and reviewing the invoice itself.

In summary, **it is undisputed that there is no evidence in the record that Kaspers acquired, during his association with F&P, any of the substance, content or communications relating to the wage and hour advice provided to Dixie by F&P on February 28, 2000, and the only information Defendants want this Court to infer is that Kaspers acquired the information reflected on the**

35

**March 17 invoice, which became a matter of public record and general public knowledge and lost its confidential and protected status on or about October 30, 2000, three years and three months before Kaspers and his firm met any of the Plaintiffs herein. The record is thus devoid of any evidence of confidential and protected information that Kaspers could reveal or use to Dixie's disadvantage to support the Plaintiffs' claims in the instant litigation.**

7.      While Defendants cite pages 77-79 of Kaspers deposition for the proposition that "while he was at Fisher & Phillips...no one ever refused to give [Kaspers] a file" (June 25 Memo, p. 11), a closer inspection of Kaspers' testimony is again informative:

> Kaspers:    I only retrieved or attempted to retrieve files relating to matters I was working on....[T]he only files that I requested were files relating to matters that I was working on. And I can't think of an instance when I requested a file relating to a matter that I was working on and didn't have it provided to me. **I never requested files that I was not responsible for and working on. And so, there was never an opportunity for someone to say no because it was not my procedure to go searching for files that I had no business or involvement with.** (Kaspers 5/27/04 Dep. 79:15-80:6 [emphasis added]).

While Defendants, in an obvious attempt to analogize Kaspers to the lawyer described in Comment 6 to Rule 1.9 who "may have general access to files of all clients of a law firm," contend that Kaspers had general and unrestricted access to any files he wanted (June 25 Memo, pp. 4-5), the evidence of record shows that

Kaspers was the contrasting lawyer in Comment 6 who had access to the files of only a limited number of clients—his. Kaspers explained that access to F&P's file room was only by combination and with the presence and approval of the file room manager or attendant (id. 76:18-77:13), and that during his last 5 years with F&P (from 1985 to 1990), others retrieved the case files that Kaspers needed and gave them to Kaspers (id. at 78:22-79:4). No evidence has been presented that any Dixie case files were ever maintained in F&P's file room. Sandberg didn't know whether any were kept there (Sandberg Dep. at 37:9-12). As Kaspers explained, some attorneys kept all of their files either in their personal office or nearby (Kaspers Dep. at 76:3-9). Sandberg testified that the redwells containing the work she did for Dixie, including the one redwell containing the documents prepared for the employment practices/law review, were maintained either in Sandberg's office or at Brannen's secretary's desk outside Brannen's office (Sandberg Dep. at 22:20-21, 36:11-14, 36:25, 37:1-2, 37:9-12, 42:15-16, 46:6-7 and 46:14). **There is no evidence that Kaspers ever saw or had access to those files.**

8.     Defendants raise a number of other "red herrings" in their June 25 Memo which are unsupported by the evidence of record. Kaspers had access, through the firm's librarian, to memoranda and briefs in F&P's research reference system (Kaspers Dep. at 80:16-19, 81:4 and 81:9-10). However, there is no evidence that

any memorandum or brief prepared for Dixie, or any document prepared for the Phase Two February 28 Employment Law Review was ever placed in and thus made a part of F&P's research reference system so as to be accessible to Kaspers.

While Kaspers also admitted that some attorneys used F&P's email system to conduct conflicts checks (id. at 73:21), there is no evidence that Dixie was ever the subject of such an email.

The only billings matters discussed at pre and post reconstituted Team One meetings were instructions to "get your bills out quickly" (id. at 152:17 and 161:18-19) and "collect your old money" (Brannen Dep. at 60:16). There is no evidence that billing matters relating to Dixie were ever discussed at a pre or post reconstituted Team One meeting. While Defendants nevertheless want this Court to infer, from the fees complaint F&P filed against Dixie on October 30, 2000, that billing must have been discussed at some Team One meeting and that Kaspers was present during such a discussion, Exhibit G to F&P's October 30, 2000 fees complaint against Dixie (part of Exhibit 2 to Sandberg's deposition) shows that F&P informed Dixie on August 11, 2000 that Dixie had until August 23, 2000 to pay all outstanding invoices or a collection action would be pursued. Kaspers left F&P on August 18, 2000 (Kaspers Dep. at 163:20)—a week before Dixie's payment(s) were expected and due.

Because of his experience, Kaspers was consulted by other F&P lawyers about employment litigation-related matters (id. at 28:4-5 and 54:14-16).   However, Sandberg only came to Kaspers once—to ask a question about evidence, not about wage and hour law, which Kaspers declined to answer until Sandberg first ran the question by her supervising attorney (Kaspers Dep. at 26:19-27:4 and 63:10-12; Sandberg Dep. at 60:14-18).   Sandberg was never supervised by Kaspers (id. at 56:13-20).   She never worked with Kaspers on any matter (id. at 56:21-57:2 and 57:16-23), including any of the wage and hour work that Sandberg did for Dixie and/or its affiliate GutterGuard (id. 83:11-13).

While Kaspers was also in charge of litigation training and litigation practice group lunch meetings, Sandberg never attended litigation training or any litigation practice group luncheon (Sandberg Dep. at 63:13-17).   The reason why she did not is also a matter of record:   Sandberg expressed a preference to develop as a trainer, not as a litigator (id. at 61:4-12).   In 6½ years with F&P, Sandberg has taken only one deposition (id. at 7:2-5).   She clearly swam in a different pond than the most experienced employment litigator at F&P's Atlanta office.

Sandberg admitted that she never went to Kaspers for guidance or advice or otherwise ever discussed with Kaspers any training of wage and hour related matter (see, generally, id. at 59:9-24 and 61:19-62:8 and specifically id. at 62:5-8 [Q:

"...[Y]ou don't remember...ever discussing training with me, do you? A: No."] and id. at 59:23-24 ["I don't recall ever discussing wage/hour with you"]). Brannen said he never sent Sandberg to Kaspers for such advice (Brannen Dep. at 64:13).

9.    Plaintiffs have no idea why Defendants continue to discuss Kaspers' communications with his former F&P partner Thompson in connection with the pending motion. Thompson became aware that Kaspers was representing clients who were suing a former client of F&P when Thompson saw Kaspers' March 1, 2004 letter to F&P ("Attachment G" hereto). Kaspers thus effectively notified Thompson of the instant litigation before Kaspers and Thompson communicated by phone on other matters in March and April of this year (Thompson Dep. at 21:11-14, 23:4-6, 34:5-7 and 43:2-5). Kaspers reminded Thompson during the March call that Kaspers and his firm were representing plaintiffs in a wage and hour suit for unpaid overtime compensation (id. at 35:12-14). At no point did Kaspers ever ask Thompson for advice on the wage and hour case Kaspers and his firm were handling for the Plaintiffs (id. at 38:3-6), and Thompson never discussed any legal theory or facts relating to the case with Kaspers (Thompson 5/3 Aff., p. 2, ¶ 4). Disqualification cannot be based upon what Thompson says he believed Kaspers might have been thinking but never expressed (see Thompson Dep. at 34:22-35:7)—particularly after Thompson conceded that he is neither a psychic or a clairvoyant and proved during

40

his deposition that he was neither (Thompson Dep. at 8:16-21, 8:22-9:7, 11:22-12:6, 38:7-25, and 41:6-9), and that he "could be mistaken" (id. at 22:15).

10. Defendants' continued reference to Kaspers' communications with his former F&P partner and wage and hour mentor Henry Huettner is equally confounding. Huettner terminated his association with F&P 10 days before Kaspers and Huettner met for lunch on January 26, 2004 (Thompson Dep. at 15:13-16; Kaspers Aff., pp. 10-12, ¶¶ 19-23). Huettner asked Kaspers not to identify the client whom Kaspers and his firm's clients were contemplating representing (Kaspers Dep. at 183:3-6). Most importantly, because there is no evidence Huettner ever acquired confidential and protected information regarding F&P's former legal representation of Dixie, nothing in the Rules prevented Huettner discussing this case with Kaspers after Huettner retired.

## Conclusion

Defendants obviously would prefer not to litigate against a lawyer who has developed a reputation as a vigorous advocate for the interests of his clients (Brannen Dep. at 64:24-65:3). However, Defendants have not satisfied their burden of presenting evidence justifying disqualification. The factual issues and credibility determinations Defendants would like this Court to resolve are immaterial to the question of whether Kaspers had acquired information that was confidential and

protected from disclosure to Plaintiffs. All of the information that Kaspers acquired regarding Dixie is a matter of public record and was obtained by Kaspers from the public record. There is no evidentiary basis to disqualify Kaspers or his firm. This Court should enter the proposed findings and conclusions, attached hereto as "Attachment H," denying Defendants' motion and allowing Plaintiffs to continue to prosecute their claims with their chosen counsel.

Respectfully submitted,

William F. Kaspers, Ga. Bar No. 408575
Katherine A. Brokaw, Ga. Bar No. 084268
Sherri L. Kimmell, Ga. Bar No. 419135
Deborah V. Haughton, Ga. Bar No. 338038
KASPERS & ASSOCIATES LAW
 OFFICES LLC
75 14th Street, Suite 2130
Atlanta, GA 30309
404-888-3740 / 404-888-3737 (Fax)
Counsel for Plaintiffs